644 A.2d 777

## Mary Jo LABAR

v.

## Thomas S. LABAR, Appellant.

Superior Court of Pennsylvania.

Argued Jan. 11, 1994.

Filed July 11, 1994.

614

Kimberly A. Cicci, Bangor, for appellant.

April L. Cordts, Easton, for appellee.

Before CIRILLO, BECK and HOFFMAN, JJ.

CIRILLO, Judge:

Thomas S. Labar (Husband) appeals from an order entered in the Court of Common Pleas of Northampton County dismissing Husband's objections to support calculations and affirming an earlier order directing Husband to remit spousal and child support payments in the amount of $474.00 per week. We vacate and remand.

On November 6, 1992, a petition for support was filed on behalf of appellee Mary Jo Labar (Wife) and two minor children, Ryan and Jason Labar. An order of support followed, providing that Husband pay $144.00 per week for

spousal support, $251.00 per week for child support, and $79.00 per week in arrearages—for a total of $474.00 per week. The trial court based these amounts on its determination that Husband's net income was $1,203.73 per week. Husband was given credit for remitting weekly payments of $36.46 towards a second mortgage loan on the marital residence and weekly payments of $76.00 on another support obligation. Objections were filed by Husband, and a hearing was held to adjudicate the issue of support payments. The Honorable James C. Hogan subsequently affirmed the support order.

Husband filed a petition for reconsideration challenging the court's calculation of his disposable income. Specifically, Husband argued that the trial court improperly inflated Husband's disposable income by factoring in fifty percent of depreciation expenses and entertainment expenses of Blue Valley Lanes, Inc. (Blue Valley), a Subchapter "S" Corporation (S–Corp.),[1] of which Husband is a fifty percent shareholder.

Judge Hogan denied Husband's petition for reconsideration, and this appeal followed. Husband raises the following issues for our consideration:

(1) Whether the trial court abused its discretion when it included S–Corp. depreciation of corporate assets, as part of appellant's disposable income for calculation of support payments, when the entire depreciation amount was expended on debt obligations and other necessary business expenses?

(2) Whether the trial court abused its discretion when it included entertainment expenses expended by a S–Corp., in which appellant is a fifty percent (50%) shareholder, as part of his disposable income for calculation of support payments?

1. Without delving into a full explanation of the structure of an S–Corp., the significance of the designation, for purposes of this opinion, is as follows. First, it is a designation for federal income tax purposes and has no effect for corporate law purposes. Second, the chief characteristic of an S–Corp. implicated in Mr. Labar's case is that income or losses are not recognized at the corporate level, but flow through to the individual members. *See generally* I.R.C. § 1361 *et seq.*

(3) Whether the trial court abused its discretion in rendering an opinion that is inconsistent with its previous, recent order, in a case involving appellant in which it held that appellant did not recognize any disposable income from the S–Corp. because the depreciation was offset by corporate expenses?

## I. *The Standard of Review*

Initially, we note that our standard of review for claims concerning support orders is a narrow one.

A trial court has broad discretion concerning support payments and we will not reverse its decision unless there is insufficient evidence to sustain it or the trial court abused its discretion in fashioning the award. More than mere error of judgment is required, discretion is abused only if the law is overridden or misapplied or the judgment exercised is manifestly unreasonable.

*Caplan v. Caplan,* 400 Pa.Super. 352, 355, 583 A.2d 823, 824 (1990) (quoting *Lesko v. Lesko,* 392 Pa.Super. 240, 243, 572 A.2d 780, 782 (1990) (citations omitted)).

## II. *The Depreciation Expense*

Husband is a fifty percent owner of Blue Valley, a bowling alley where he works full time, acts as manager, and does all of the accounting and ordering. Husband contends that the court abused its discretion by doubling the financial resources he "actually received" in 1991 in its calculation of his support obligation, the exaggerated figure resulting largely from the trial court's inclusion of one-half of Blue Valley's depreciation expenses, or $34,066.00.[2] Thus, in 1991, $34,066.00 worth of depreciation and $1,914.50 of entertainment expenses were

2. The trial court also included entertainment expenses of $1,914.50, which will be discussed below. The Hearing Officer of the Domestic Relations Section of the Court of Common Pleas of Northampton County included these as part of Husband's disposable income based on the Wife's objection to these amounts being excluded.

added to Husband's disposable income of $32,627.00 [3] in its determination of Husband's support obligation; for a total disposable income of $68,607.50.

As a threshold matter, it is critical to recall that the purpose of reviewing a business transaction of either spouse is to prevent one or the other from *sheltering* actual personal income that should be included in calculating child support. The Supreme Court of Pennsylvania has recognized that a parent may not "voluntarily decrease" the ability to provide support by sheltering income through *"unreasonable* or unnecessarily large expenditures for his or her *own* benefit." *Meltzer v. Witsberger,* 505 Pa. 462, 472, 480 A.2d 991, 996 (1984) (emphasis added) (citing *Costello v. LeNoir,* 462 Pa. 36, 40, 337 A.2d 866, 868 (1975)). *See also King v. King,* 390 Pa.Super. 226, 568 A.2d 627 (1989).

Despite the apparent clarity of this standard, its application has proven most difficult. The courts of this Commonwealth have seemingly seized upon this touchstone and used it as a springboard for advancing an otherwise unwarranted position. This process began with the language used by the majority in *Cunningham v. Cunningham,* 378 Pa.Super. 280, 548 A.2d 611 (1988),[4] which stated, *"depreciation and depletion expenses* should be deducted from *gross income* only where they reflect an *actual reduction* in . . . *personal income." Id.* at 282, 548 A.2d at 613. This language implies an analysis of the reasonableness of the depreciation or depletion expenses taken to

---

3. This income figure consists of $26,000.00 in personal income, $2,527.00 in interest, $3,540.00 in profit to Blue Valley, and $560.00 in amortization. These amounts are uncontested.

4. Although the dissent makes a point of resting on *McAuliffe v. McAuliffe,* 418 Pa.Super. 39, 613 A.2d 20 (1992), we find that the facts of that case are sufficiently close to *Cunningham* and *McAuliffe*'s reliance so dependent on *Cunningham,* so as to require only a single discussion of the seminal case of *Cunningham.* We further distinguish *McAuliffe* from the facts at hand by noting that *McAuliffe* involved a dramatic and unexplainable increase in capital outlays from one year to another ($66,046 in 1989 to $201,894 in 1990). *McAuliffe,* 418 Pa.Super. at 43, 613 A.2d at 22.

determine whether they in fact reduced the income of the business, and consequently, the personal income of Husband.[5]

The *Cunningham* majority, however, continues with an example, stating, "such as where, e.g. he or she actually expends *funds* to replace *worn equipment* or purchase new reserves." *Id.* (emphasis added). This language implies an analysis of the reasonableness of the initial outlays on assets. These are two discrete inquiries, which, improperly, have been merged into one. This point is strengthened by the fact that the court then analyzed the facts of *Cunningham* using only the second part of this language. The majority states, "[the defendant] does not claim ... that he in fact spent any of his $24,000 [*gross*] *income* ... to replace ... or purchase new ... reserves." *Id.*

Both of these statements implicate opportunities in the operation of a business when it is possible for the proprietor to shelter income:[6] by manipulating the purchases and other cash outflows of the business and by manipulating the accounting of those transactions. These situations create two related, but independent inquiries which must be resolved.

First, a choice of accounting methods may be utilized to raise or lower the depreciation expense taken so as to raise

---

5. The income, deductions, and debts of a business do not translate directly into income, deductions, and debts of the proprietors. It is only through the operation of federal tax law or state partnership law that this occurs. Here, it is only because Blue Valley is an S–Corp. that its gross income and depreciation expenses can be translated into those of Husband. *See supra,* note 1.

6. A third opportunity occurs when subtleties in the federal tax law are utilized to manipulate numbers to benefit the taxpayer. This court addressed this point in *Cunningham* and earlier cases, stating that the disposable income of the parent "must reflect actual available financial resources and not the oft-time fictional financial picture which develops as the result of depreciation deductions taken against ... income as permitted by the federal income tax laws. Otherwise put, 'cash flow' ought to be considered and not federally taxed income." *Cunningham,* 378 Pa.Super. at 282, 548 A.2d at 612–13 (quoting *Commonwealth ex rel. Hagerty v. Eyster,* 286 Pa.Super. 562, 568–69, 429 A.2d 665, 668–69 (1981) (citations omitted)). *Accord, Flory v. Flory,* 364 Pa.Super. 67, 527 A.2d 155 (1987); *Parkinson v. Parkinson,* 354 Pa.Super. 419, 512 A.2d 20 (1986).

or lower net income.[7]   When gross income is reduced, this produces a marginal income tax savings, which then becomes income that is available to the business or that can be distributed to the proprietor as he or she may choose.   Thus, in inquiring into whether the depreciation and depletion expenses reflected an *actual* reduction in Husband's personal income, under *Cunningham,* we must look at whether any such marginal income created through tax savings was reinvested in the business or distributed to the Husband directly.

■   Second, even if the accounting method is unaltered, the proprietor may simply make substantial capital outlays, which will proportionately increase the depreciation expense, even though the capital outlays are unnecessary to maintain the business.[8]   Thus, we must also inquire as to whether the capital outlays underlying the reduction were *necessary,* under *Cunningham,* or whether they represented an attempt to shelter income for purposes of avoiding spousal and child support obligations, under *Meltzer.*   Each must be examined *separately* and the trial court must be clear as to which factor it is scrutinizing.

### A.   The Propriety of the Expenses

■   Before proceeding with the first part of the analysis, we must recognize that it is not unusual in a small business setting, such as this, for a proprietor to own as well as manage the business.   This arrangement does not render a proprietor's business decisions inherently suspicious or unreasonable.   When these business decisions impact other obligations, such as support payments, an inquiry by the courts should be carefully tailored.

7.   For example, a business may choose to depreciate an asset by straight-line depreciation (taking an equal portion over a period of years), by double declining balance (two times the amount calculated by the straight-line method), or under ACRS (accelerated cost recovery system) as set forth in I.R.S. regulations.

8.   It is important to note that capital outlays of a business reflect purchases made from cash or on credit and affect the net income of a business *only* to the marginal extent that they generate expenses (such as depreciation or interest).

620

In *Commonwealth ex rel. ReDavid v. ReDavid,* 251 Pa.Super. 103, 380 A.2d 398 (1977) and its progeny, the court expressed a concern with allowing a depreciation expense for real estate, which is permitted for federal income tax purposes, to reduce available income for support. *See also Lyday v. Lyday,* 360 Pa.Super. 16, 519 A.2d 967 (1986). In *ReDavid,* the court found that recognizing such an expense for support purposes was legitimate, since real estate is an asset which generally appreciates in value, making it possible for its cost to be fully recovered upon resale. Thus, taking a depreciation expense against this asset creates somewhat of a financial fiction by improperly deflating net income of the business. However, as with those in question here, most other classes of assets actually do decrease in value as time passes and depreciation legitimately, and more appropriately, represents the recovery of cost less resale value, over the useful life of the asset.

Depreciation, however, does not translate directly into cash flow, as its direct effect is on the tax liability of the business. This reduction in tax liability is not a dollar for dollar relationship, but rather is a product of the tax rate applied to the income. Therefore, savings are created from the depreciation which marginally increases the cash flow of the business. This court recognized this fact in *Williams v. Williams,* 175 Pa.Super. 409, 413, 104 A.2d 499, 501 (1954), stating, "Although depreciation must not be treated as an expense, neither can it be treated in the same category as net profit." Likewise, this court has allowed only a portion of depreciation, representing monies actually available to the defendant for personal use, to be considered when making a support award. *See Commonwealth ex rel. Maier v. Maier,* 274 Pa.Super. 580, 418 A.2d 558 (1980).

In general, there should be little concern over the amount of depreciation as it is limited to very specific regulations set forth by the Internal Revenue Service, which cannot

be manipulated without risking income tax fraud.[9] With this in mind, a finding of unreasonable depreciation expense by the court should be limited to those cases where there is evidence of blatant unreasonableness or vast change in expenditures from one year to another. *See Snively v. Snively,* 206 Pa.Super. 278, 212 A.2d 905 (1965). No such manifest unreasonableness in the figures exists here. The largest change in amount of depreciation taken by Husband occurred between 1990 and 1991. This change is legitimately explained by the use of a half-year convention for taking depreciation [10] between 1990 and 1991. N.T. 4/1/93 at 18. This decision, by its very nature, is contrary to the notion that the expenditures were made with the intent to minimize net income, since that switch served to "spread out the depreciation over the longest period of time." N.T. 4/1/93 at 18. Thus, standing alone, the switch to a mid-year convention for taking depreciation increased net income which would be available for support.

Moreover, our reading of the record reveals ample evidence that the marginal income made available through Husband's depreciation expenses was actually expended on Blue Valley in the satisfaction of principal on business loans which were due in that year,[11] as well as on the purchase of

9. Our review of the record indicates that more conservative depreciation figures were used by Blue Valley on IRS Form 4562 (Schedule of Depreciation and Amortization) for each of the relevant years, as compared to the figures used in the Statement of Income of Blue Valley for those same years.

10. This applies to property placed in service during the taxable year. I.R.C. § 168.

11. For example, Husband's testimony on direct examination revealed the following:

> Q. Mr. Labar, going to the 1991 tax return, referring you to ... the depreciation line ... the amount is, I believe, $68,000.00 approximately. You indicated that [this] is supposed to generate cash flow in your introductory remarks.... In terms of applying that $68,132.00 figure to operating costs of the business, could you explain to the court how that figure was directly applied to your business expenses? [HUSBAND]: Okay. You have $68,000 in depreciation that is generated. That generates you a cash flow.... [O]ur debt exceeded, at that time, $950,000. In order to cover that, you have to generate a cash flow and be able to prove to the bank you are going to cover your debt. Your short term debt for that year alone was $46,700. So

new equipment.[12]  Husband further testified as follows:

Q.  In terms of that [1991] $68,000 depreciation figure, does that relate in any way to any income directly for either you or your partner?

[HUSBAND]:  No, John and I don't have access to that income.  That income has to be programmed to be put back into the business to keep the operation of the business going.

\*     \*     \*     \*     \*     \*

Q.  Mr. Labar, in 1992, the figure on depreciation, did either you or your partner realize any cash or income that you could dispose of, personally?

[HUSBAND]:  No.  You can't write yourself a check for the depreciation.  If we started taking money out of that business and don't do what we are supposed to, we have the bank looking over our shoulders to tell us we are wrong. We just can't write checks whenever we please.  If there is extra money there, we could write ourselves a small bonus, maybe, somewhere down the road.  But right now the way it is structured it is a long-term investment for us and we have got to keep the place running.

N.T. 4/1/93 at 17, 21–22.  We find, therefore, that the expenditures did, in fact, reduce Husband's actual income.

## B.  The Necessity of the Capital Outlays

We turn now to the second part of the analysis dealing with the *necessity* of Husband's expenditures on the particular

if you have to cover that short term debt, that has to be paid off in that year.  That gives you an extra $20,000 to work with.  Of that $20,000, that goes into other expenses, other improvements, other places where in the corporation you will need money, upgrading your chassis, your computer works, your motors, your machinery, buying a new lane machine. . . .  That is how the money is used.  And that is the same thing in 1992.
N.T. at 15–16.

12.  The record reflects that, starting in 1990, Blue Valley's new equipment/improvements included the following:  24 pin setters ($260,760); computer score system ($135,362);  12 lanes of permanent bumpers ($12,600);  4 pin decks ($3,900);  updated phone system ($2,585);  new alarm system ($2,175);  and paving ($4,590).

assets at issue. *McAuliffe,* 418 Pa.Super. at 44, 613 A.2d at 22.[13] As stated earlier, the intent to shelter income by Husband may also exist if it was unreasonable for Husband to make the initial purchase of the assets for which the depreciation expense was later taken. *Meltzer,* supra. The trial court, in its opinion, addressed Husband's testimony regarding the propriety of the expenditures on assets as follows: "What defendant fails to state is that he is building up equity in his business and creating a 'good bowling center for the community' at the expense of his children's support. We cannot and will not permit this to occur." Before the court reached this conclusion, it pointed out the fact that Husband made no mention of the amount of increased income generated by the business's improvements, that Husband did not testify as to whether the improvements were necessary to maintain the current level of business, that Husband stated that the federal tax profit of $7,511.00 was reinvested in the corporation, and that Husband admitted that his equity in the business is increasing as each year passes.

Husband's testimony at the hearing, however, did indicate that when the business was purchased in 1985, the partners had a long range plan to update the bowling alley year to year, "taking the money and not putting it back in our pockets but putting it back in so that the community would have a good bowling center over the years." N.T. 4/1/93 at 13.

It is natural for a business to make investments which negatively impact the short term profit of the enterprise with the expectation of greatly increasing long term profits. *See Weiser v. Weiser,* 238 Pa.Super. 488, 362 A.2d 287 (1976). It is unrealistic to expect a person to make an investment without expecting a reasonable return. Moreover, the maintenance and preservation of a business requires more than simply a coat of paint in order to maintain competitiveness. Equipment must be updated to meet the standards in the industry. It is unlikely that a bowling alley which maintains

**13.** Although the "necessary" language was never used in *Cunningham,* we agree that this standard is proper given the countervailing importance of the support obligation.

manual scoring will be very competitive in its industry when all the other alleys have computerized scoring systems. The possibility that Husband's business decisions could be motivated by an attempt to shelter his income from support obligations is not evident from these facts. A groundless business decision to expend sums proportionately large as compared to the income of the business,[14] based only on malicious intent, would certainly adversely affect the business to a greater degree than could possibly benefit Husband by reducing his support payment. Absent specific evidence of intent to shelter income in the record, it must be presumed from the facts that the expenditures on the assets mentioned were legitimate and necessary. *See Weiser,* 238 Pa.Super. at 491, 493, 362 A.2d at 288, 289.

Recognizing Husband's primary obligation of support, we cannot, based on this record, uphold a computation of support that is based upon an inflated disposable income. Adding $34,066.00 to Husband's income under the instant circumstances creates a "fictional financial picture." *Cunningham,* 378 Pa.Super. at 282, 548 A.2d at 612–13. As revealed at the support hearing, these monies must be viewed as business assets, allocated to the replacement of worn out equipment, new equipment (such as the computerized scoring system), and business debt. We conclude, therefore, that the law has been misapplied by the trial court. *Caplan, supra.*

■ The support payments in question must only be taken from that amount available to Husband personally, after the business has been taken into account. *See Beegle v. Rasler,* 395 Pa.Super. 174, 576 A.2d 1100 (1990) (when considering a parent's ability to pay support, the ultimate goal is to arrive at a monetary figure which accurately represents a parent's ability to pay, while providing that parent with a reasonable allowance). Once again, it has been noted by this court that, "[i]f, for the purpose of complying with a court order, a man is compelled to expend or exhaust his capital, without opportuni-

14. Expenditures, beginning in 1990, totaled $412,622.00. *See supra,* note 5. In fact, there were net losses of $51,840.00 for 1990 and $26,357.00 for 1991.

ty to maintain and preserve that which makes his business possible, it will eventually work to the detriment of both parties." *Williams,* 175 Pa.Super. at 413, 104 A.2d at 501. Given the instant circumstances, we are of the opinion that the trial court misapplied the law in failing to correctly analyze Husband's situation in light of the reasoning and case law set forth above. *Caplan, supra.*[15] Thus, the inclusion of fifty percent of the depreciation value on Husband's income unfairly impacted upon his support obligations. We remand this issue for a corrected determination of Husband's disposable income.

### III. *The Entertainment Expenses*

Husband's second issue concerns the inclusion of entertainment expenses in the amount of $1,914.50 in his disposable income for support purposes.[16] While we are of the opinion that the analysis used in the depreciation expense issue is also pertinent to the entertainment expense issue, we are precluded from reviewing that question at this juncture. The only mention of Husband's entertainment expenses at the support hearing is reflected in the following exchange:

THE COURT: All right. Let's take a little testimony....

COUNSEL FOR HUSBAND: I think the other issue was entertainment expenses, I don't know if you want to cover that at all.

THE COURT: Were they substantial?

COUNSEL FOR HUSBAND: They are not that substantial.

COUNSEL FOR WIFE: I do not think we will be disputing them. I have seen copies of the statement, it is my

15. Contrary to the dissent's conclusion, this decision does not "reanalyze" the testimony. Rather, it attempts to clarify the lapse that occurred at the trial level, and in this court, as a result of a less than thorough analysis of Husband's income and a misapplication of the law.

16. The derivation of this figure is discussed in the support calculation, *supra.*

understanding the entertainment expenses are for music played at the bowling alley.

\* · \* \* \* · \* \*

THE COURT: Apparently, the only thing we have to look at is the depreciation.

COUNSEL FOR HUSBAND: Okay, fine.

N.T. 4/1/93 at 9–10. From this exchange it is evident that, at the time of the hearing, the parties did not think the amount of the entertainment expenses to be of consequence. However, if this issue is pursued further on remand, there should be additional testimony as to the necessity of these expenses on the record in order to utilize the analysis suggested herein.

We vacate and remand for a recalculation of support.[17] Jurisdiction relinquished.

BECK, J., files a Dissenting Opinion.

BECK, Judge dissenting.

This is an appeal from an order for the support of appellee wife and her two children in the amount of $474.00 per week. Appellant husband alleges that this figure is based on an erroneously high calculation of his income. He contends that the trial court erred in calculating his income by improperly including in that calculation a portion of the depreciation expenses of Blue Valley Lanes, Inc., a corporation in which husband is a fifty percent shareholder. Blue Valley Lanes owns and operates a bowling alley which Husband manages on a fulltime basis.

The majority agrees with husband and remands for a recalculation of husband's income and, therefore, of his support obligation. I disagree with this conclusion on two grounds. First, although the majority faithfully recites the standard of review applicable to an appeal from a support order, the majority fails to comply with that standard in reviewing this case. Second, the majority's resolution of the substantive

17. Due to the disposition of the first issue on appeal, it is not necessary that we reach Husband's third issue.

issue presented in this case is inconsistent with this court's clear precedent on that issue.

The majority sets forth the applicable standard of review as follows:

A trial court has broad discretion concerning support payments and we will not reverse its decision unless there is insufficient evidence to sustain it or the trial court abused its discretion in fashioning the award. More than mere error of judgment is required, discretion is abused only if the law is overridden or misapplied or if the judgment exercised is manifestly unreasonable.

Maj.Op. at 616 (quoting *Caplan v. Caplan*, 400 Pa.Super. 352, 355, 583 A.2d at 823, 824 (1990)).

This is an accurate statement of the law. *See Crawford v. Crawford*, 429 Pa.Super. 540, 633 A.2d 155, 158–59 (1993). It is not, however, all that may accurately be said of our standard of review, particularly in a case such as this where the issue is whether the trial court erred in assessing the income of the party against whom a support order is to be entered. In such a case, a panel of this court has recently stated, "[w]here the trial court finds that claims of reduced income are simply not credible, a reviewing court will generally not disturb this determination on appeal." *McAuliffe v. McAuliffe*, 418 Pa.Super. 39, 42, 613 A.2d 20, 22 (1992).

Rather than curtailing its review of the instant matter so as to remain within these parameters, the majority reanalyzes the only testimony provided on the issue of appellant's income, which was the testimony of appellant himself, and reaches a conclusion contrary to that reached by the trial court.

Moreover, in reaching this conclusion, the majority fails to follow the dictates of Pennsylvania case law in which the proper treatment of depreciation expenses in determining the income of a support obligor is clearly set forth. Older Pennsylvania cases established the principle that "depreciation is not to be considered in determining the income from which the wife may seek support." *Commonwealth ex rel. ReDavid v. ReDavid*, 251 Pa.Super. 103, 106, 380 A.2d 398, 399 (1977)

(quoting *Commonwealth v. Turnblacer*, 183 Pa.Super. 41, 44, 128 A.2d 177, 179 (1956)). *See also Parkinson v. Parkinson*, 354 Pa.Super. 419, 512 A.2d 20 (1986); *Commonwealth ex rel. Hagerty v. Eyster*, 286 Pa.Super. 562, 429 A.2d 665 (1981).

More recent cases have refined the current standard used to evaluate depreciation expenses in calculating the income of a support obligor. In *Cunningham v. Cunningham*, 378 Pa.Super. 280, 548 A.2d 611 (1988), *appeal denied*, 522 Pa. 576, 559 A.2d 37 (1989), a panel of this court opined:

> It is well established that depreciation and depletion expenses, permitted under federal income tax law without proof of actual loss, will not automatically be deducted from gross income for purposes of determining awards of alimony and equitable distribution. In determining the financial responsibilities of the parties to a dissolving marriage, the court looks to the actual disposable income of the parties:
>
> > [T]hat income must reflect actual available financial resources and not the oft-time fictional financial picture which develops as the result of depreciation deductions taken against ... income as permitted by the federal income tax laws.
>
> Depreciation and depletion expenses should be deducted from gross income only where they reflect an actual reduction in the personal income of the party claiming the deductions, such as where, e.g., he or she actually expends the funds to replace worn equipment or purchase new reserves.

*Id.* at 282, 548 A.2d at 612–13 (citations omitted). *See also Heisey v. Heisey*, 430 Pa.Super. 16, 633 A.2d 211 (1993) (actual available financial resources are correct basis for calculation of support obligor's income).

This standard was even more recently supplemented by the decision in *McAuliffe v. McAuliffe*, 418 Pa.Super. 39, 613 A.2d 20 (1992). There, the issue was whether the trial court had erred in refusing to accept the testimony of the husband concerning the necessity of certain major expenditures he had made in purchasing new equipment for his business, thereby

allegedly reducing his income available for spousal support. After stressing the narrowness of the standard of review applicable to support matters and quoting the pertinent language from *Cunningham*, the *McAuliffe* court explained:

> Furthermore, the "new reserves" contemplated above should not be read to mean an allocation for future expenditures or the expansion of a party's business. To the contrary, the cash outlays for "new reserves" must be necessary for the continued operation and smooth running of the business. *Id.* As this court has previously stated:
>
>> To allow husband to shield substantial income of his business from consideration in determining his support obligation without more evidence as to a legitimate need to do so would allow spouses with support obligations to evade their obligations by unilaterally reducing their income. This is obviously impermissible under Pennsylvania law.
>
> *King v. King*, 390 Pa.Super. 226, 568 A.2d 627 (1989).

*Id.* at 44, 613 A.2d at 22.

The *McAuliffe* court affirmed the trial court's decision that approximately $200,000 spent by husband in purchasing new equipment for his business was not proven to be "necessary to maintain or preserve the business," *id.*, and, therefore, could not be excluded from husband's income for purposes of setting his support obligation. The *McAuliffe* court specifically refused to interfere with the trial court's assessment of the credibility of husband's testimony.[1]

The *McAuliffe* court's requirement that expenditures be shown to be "necessary to preserve and maintain the business" before they may be deducted in calculating the income of the business owner is not a new concept in Pennsylvania support law. In fact, the selfsame language is found in an

---

1. The *McAuliffe* court noted that the trial court had assumed that all of the depreciation expense claimed by husband had been properly spent to replace fully depreciated equipment or otherwise to preserve and maintain the business and had thereby made husband's job of proving that his expenditures were necessary much easier. Since this assumption by the trial court was not challenged on appeal, the *McAuliffe* did not specifically review it.

630

older case, *Williams v. Williams*, 175 Pa.Super. 409, 104 A.2d 499 (1954), where the court opined:

> Although depreciation must not be treated as an expense, neither can it be treated in the same category as profit. If, for the purpose of complying with a court order, a man is compelled to expend or exhaust his capital, without opportunity *to maintain and preserve* that which makes his business possible, it will eventually work to the detriment of both the parties.

*Id.* at 413, 104 A.2d at 501 (emphasis added). Clearly the *McAuliffe* court was on solid ground in determining that only amounts expended on necessary maintenance and preservation of a business are properly excluded in calculating the owner's income.

Surprisingly, the majority makes reference to *McAuliffe* only in response to this Dissent and then dismisses the case as not apposite to the case before us. Rather, the majority crafts its own new standard and ultimately draws a conclusion that contradicts the clear mandate of *McAuliffe* and *Cunningham.* The majority requires that two questions be answered in the affirmative before depreciation expenses may properly be excluded from a support obligor's income—first, do the expenses represent an actual reduction in the obligor's income, and second, were the expenses underlying the reduction reasonable or were they an attempt to shelter income for the purpose of avoiding a support obligation. Maj.Op. at 621. Thus, the majority concludes that "a finding of unreasonable depreciation expense by the court should be limited to those cases where there is evidence of blatant unreasonableness or vast change in expenditures from one year to another." *Id.* at 781.[2]

2. The majority cites *Snively v. Snively,* 206 Pa.Super. 278, 212 A.2d 905 (1965), in support of this proposition. The issue in *Snively* was whether a father could receive a reduction in his child support obligation so that he could go to college. The court refused the reduction. The case includes no commentary whatsoever on depreciation expenses or the proper manner of calculating the income of a business owner who claims a reduced income as a result of amounts expended on the improvement of the business.

This is not the standard of decision established by *Cunningham* and *McAuliffe*. As the foregoing discussion indicates, although it is proper to ask whether the expenses represent an actual reduction in income, the second question is *not* whether the expenses were reasonable and not an intentional attempt to evade a support obligation. Rather, we must ask whether the expenses were necessary to preserve and maintain the business. *McAuliffe*, 418 Pa.Super. at 43, 613 A.2d at 22. In other words, the standard is clear. Unless the amounts expended were reasonably necessary to preserve and maintain the business, they may not be used to reduce the income available for support.

Clearly it is reasonable, as the majority states, for a business owner to invest money in the expansion of the business and in the improvement of its facilities. However, the business owner, who is also a support obligor, may not improve and expand at the expense of those to whom he or she owes a legal duty of support. That duty comes first and is "well nigh absolute." In order to expand or improve the business, the owner may be required to seek other sources of funds, such as bank loans or the owner may have to rely on his or her own resources. However, the law is clear that the overriding limitation is that it is impermissible for the owner to expand or improve the business if it means reducing the support obligations to the family. It is also impermissible for the business owner to increase the equity in the business, to his or her sole advantage, to the detriment of the support obligees. There is inherent wisdom in the principle enunciated in *McAuliffe* which the majority erodes. It provides a family with a stable source of support. It prevents a business person from using an accounting mechanism in order unilaterally to reduce the support obligations. Under the *McAuliffe* standard the business person can deduct reasonable sums to maintain and preserve the business. To expand or improve it, the business person/support obligor must rely on funds other than those necessary to support the family. The *McAuliffe* principle recognizes the need of maintaining a business as the source of

family support without sacrificing reasonable support to the family.

In this case, the trial court heard the testimony of husband to the effect that the depreciation expense at issue yielded a cash flow that was reinvested in the business. Husband testified that he and his partner had purchased the business in poor condition in a highly leveraged transaction and now needed continually to update and improve the physical plant and services of the business in order to generate income with which to pay off long and short term debt as well as to provide the community with a better bowling facility. I agree with the majority that this represents a highly reasonable course of pure business decisionmaking. However, we are not reviewing husband's decisionmaking as a business person. We are reviewing the trial court's attempt to fashion a fair and equitable support award. In doing so, we must ascertain what income husband has available for the support of his ex-wife and children, without reduction for amounts expended to achieve husband's personal goals for the expansion of his business or service to his community.

I find no error in the trial court's conclusion that in this case, husband's share of the depreciation expense of the corporation should not be subtracted from his income for purposes of calculating his support obligation. The trial court obviously did not believe that the money yielded by the depreciation expenses in this case was required to be reinvested in the business in order to preserve and maintain it. The court found instead that Husband was attempting to enhance his equity in the business at the expense of his wife and children. This is a reasonable conclusion, and certainly represents no abuse of discretion or error of law.

Since I also find no merit to either of husband's other claims of error,[3] I would affirm the order of the trial court.

**3.** Husband also contends: 1) that the trial court's decision in this case contradicts an earlier decision by the trial court in an action between husband and another woman to whom he was previously married; and 2) that the trial court erred in adding back into Husband's income an entertainment expense for music played at Husband's bowling alley. I

would affirm on the basis of the trial court opinion on both of these issues.